UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARK DANIELS,

                                        Petitioner,                    DECISION AND ORDER

-vs-                                                                             17-CV-6395 (CJS)

JAMIE LAMANNA, *Superintendent of*
*Shawangunk Correctional Facility,*

                                        Respondent.

_____

The petitioner, Mark Daniels ("Daniels"), brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Daniels challenges his conviction in the New York Supreme Court, after a bench trial, on two counts of robbery in the second degree, one count of grand larceny in the third degree, and one count of reckless driving. For the reasons discussed below, the petition for a writ of habeas corpus is denied.

BACKGROUND[1]

The following facts are undisputed by the parties. Shortly after 5:30 p.m. on December 16, 2011, less than thirty minutes from the close of business, an individual wearing a hooded sweatshirt, black spandex pants, white shoes, dark gloves, and a face covering, entered the branch of Evans Bank located in Amherst, New York, jumped over the counter, and took more than $4,000 in cash from the drawer of Ann Ostrowski, the lone bank teller still on duty that evening. The individual also grabbed from the drawer a packet

---

[1] The following background is drawn primarily from the transcripts of Petitioner's three-day bench trial before the Honorable Michael L. D'Amico of the New York Supreme Court, Erie County. Trial Tr., vols. I, II, III, and IV, Dec. 10, Dec. 11, Dec. 17, and Dec. 18, 2012. Because the transcripts were consecutively paginated, where appropriate the Court will cite to the transcripts using a single abbreviation: "Tr."

of bills containing a hidden GPS tracker, which he placed in a light-colored bag with the rest of the cash. The robbery was also witnessed by Mark Galantowicz, the bank employee in charge of personal banking. Galantowicz observed the robbery from his nearby office, noted the robber's appearance, and followed the robber at a careful distance as he exited the branch, got into the driver's side of a light-colored sedan, and drove away. Both Ostrowski and Galantowicz testified that the robber's face covering prevented them from making a positive identification of the robber, but that they were able to discern that he was an African American male.

The GPS tracker had automatically activated upon its removal from Ostrowski's teller drawer, and within minutes the Amherst police were able to trace the location of the stolen cash to the nearby intersection of Bailey Drive and Eggert Road in Amherst. When officers arrived at the intersection of Bailey and Eggert, they stopped traffic and began screening vehicles for individuals matching the description of the Evans Bank robber. Soon thereafter, Officer Daniel Busher noticed Daniels in the driver's seat of a light silver Chevrolet Impala, waiting to move south on Bailey Drive. Officer Busher immediately drew his weapon and directed Daniels to exit the vehicle. Rather than comply, Daniels maneuvered his vehicle onto the curb – nearly striking Officer David Awald, who had moved in to assist Officer Busher – and sped away down Bailey Drive. The ensuing high-speed chase, which involved several police vehicles over several miles and speeds exceeding 80 miles per hour, ended when Daniels crashed into two other vehicles. Daniels was apprehended by police at the crash scene, in possession of a white bag containing over $4,000 in cash and the GPS tracker from Evans Bank.

At trial, in Daniels' papers contesting his conviction in state court, and in the present petition, two different accounts emerged regarding how Daniels came into possession of the bag containing the cash and the GPS tracker. The prosecution argued that Daniels was in possession of the of the bag because he was the individual who robbed Evans Bank. In support of its position, the prosecution presented substantial evidence. In addition to Daniels' possession of the bag of cash with the GPS tracker, and the high speed chase, the prosecution introduced evidence that Daniels was wearing black spandex pants and white shoes at the time of his arrest (Tr. at 170–71), and that police recovered a pair of dark gloves from his vehicle (Tr. at 194). Moreover, the prosecution introduced evidence that police witnessed Daniels throw a hooded sweatshirt from his car during the car chase (Tr. at 115, 134), and later recovered that sweatshirt and a ski mask from along the route of the chase (Tr. at 156). Police conducted a DNA analysis of the sweatshirt and ski mask, and found that Daniels could not be excluded as a contributor to the DNA on the sweatshirt (Tr. at 248), and that the DNA on the ski mask matched Daniels' DNA profile (Tr. at 249).

For his part, Daniels reiterated that neither bank teller Ostrowski, nor personal banker Galantowicz, were able to positively identify him as the perpetrator of the robbery. Tr. at 23, 51. He also provided a different reason for his high-speed flight from the police, and a different account of how he came to possess the bag of cash. Daniels' explanation was most clearly and concisely presented in an affidavit he submitted to the trial court in support of his *pro se* post-trial motion to vacate his judgment of conviction in 2016:

> . . . I was either at a restaurant having dinner with my girlfriend or on the telephone with her as I was leaving the dinner date, at the purported time of the robbery . . . .

3

> . . . [I]mmediately after I ended the telephone call with my girlfriend, I saw
> someone running towards me. That person stopped on the side of a pet store
> and put something under a dumpster. He or she then fled in a different
> direction. I went to see what was stashed under the dumpster. I saw a sack
> with money and clothing inside. I took it and ran to my car which was nearby.
> I drove away, and shortly afterwards I was surrounded by police when I
> stopped at a red light. I panicked and fled the scene.

Ex. 1 (Aff.), 31–32, June 19, 2017, ECF No. 1-1. In his opening statement at trial, defense

counsel explained that the reason for Daniels' panic was that he did not have a "proper"

driver's license. Tr. 18.

Daniels attempted to introduce evidence supporting his account on the final day of

his trial, December 17, 2012. Tr. at 270. After the defense had formally rested, the following

exchange occurred involving defense counsel, the trial court, and Daniels:

> [Defense Counsel]: . . . [T]here is a piece of evidence, a Samsung phone that
> was found at the scene in the car that Mr. Daniels was in. And according to
> Mr. Daniels he believes it has some evidence on it in terms of phone calls . . . .
>
> * * * *
>
> [Defense Counsel]: . . . [M]y client tells me it would indicate and show that he
> was on the phone during the chase, right?
>
>
> [Daniels]: I had incoming calls. I was on the phone at the time this happened,
> your Honor, so it wasn't no way I could be doing a robbery and on the phone at
> the same time. My last 2 or 3 incoming calls were proof of the date and time.
>
> * * * *
>
> [Defense Counsel]: . . . . Mr. Daniels is asking that the Court allow him to
> reopen the case. He would like to put his girlfriend on to testify as to phone
> calls that were made between him and her at the time of the alleged bank
> robbery and that she would be able to testify as to this being his phone. And if
> we could turn it on or have the ability to turn it on we would be able to see that
> there were recent phone calls at that time, same exact time as the bank
> robbery.

4

* * * *

[Defense Counsel]: . . . it would seem to spill over into the arena of alibi because I think that [the] testimony that Mr. Daniels wants me to elicit from his girlfriend is that they were engaged in dinner at the same exact time [as the robbery] at a restaurant . . . . Your Honor, between Mr. Daniels and myself and the Court I was only made aware of this defense as of last Tuesday [i.e., December 11, 2012, the first day of the bench trial] . . . . I knew that [his girlfriend] existed I did not know that she would testify as to a dinner at the same exact time as the bank robbery.

* * * *

THE COURT: . . . . [I]f you think you are just going to call [Daniels' girlfriend] in here to say I was having dinner while this bank was being robbed, I don't think so, not at this stage of the game. But I might allow evidence of the fact that she was on the phone with him or that phone calls were made . . . . She's not coming in, but I think [the phone] might have some value.

* * * *

THE COURT: . . . . I'm going to allow you an opportunity to recharge that [phone] and look at it and if there is something that should be called to my attention I'm sure somebody will do so. Obviously, I want to review the evidence. You have got until . . . tomorrow morning before I need to see it, okay?

Tr. at 272–274, 299. The following day, defense counsel provided the Court with an update regarding the phone evidence. Counsel stated that he had spoken with Daniels' girlfriend, and that she had assured him she would search for Daniels' charger so that the Court could view the evidence of incoming calls. However, the girlfriend never called counsel back, and counsel was unable to find an alternate charger despite his independent research with "some local cell phone places." Tr. at 301–302.

Thereafter, the trial court rendered a verdict of guilty as charged on two counts of robbery in the second degree, one count of grand larceny, and one count of reckless driving. Tr. at 302. Daniels was given a determinate sentence of fifteen years imprisonment and five years of post-release supervision on the two robbery counts, an indeterminate sentence of

between three and one-half years and seven years imprisonment on the larceny count, and one year imprisonment on the reckless driving count.

Daniels appealed his conviction to the New York Supreme Court's appellate division, which "reject[ed] [his] contention that the evidence is legally insufficient to support the robbery and grand larceny convictions." *People v. Daniels*, 125 A.D.3d 1432 (N.Y. App. Div. 2015). Noting that the evidence "included the stolen GPS unit and prerecorded bait money in defendant's bag that he dropped when apprehended by police, clothing removed from the defendant . . . which matched the bank employees' descriptions, and the presence of defendant's DNA on clothing found in the middle of defendant's route fleeing from the bank," the appellate division concluded that the trial court's decision was based on "a valid line of reasoning and permissible inferences that could lead the court in this nonjury trial to find that defendant" was guilty as charged.[2] *Id.* at 1432–33. Daniels' application for a certificate granting leave to appeal to the New York Court of Appeals was denied.

At the trial court level, Daniels also filed two motions to vacate his judgment pursuant to New York Criminal Procedure Law § 440.10. Daniel's second § 440.10 motion, filed in 2016, is most relevant to the present petition. In that motion, Daniels argued that his conviction should be vacated on the grounds that his trial counsel was ineffective, as evidenced by counsel's failure to obtain and introduce into evidence Daniels' cell phone records from his service provider. These cell phone records, obtained by Daniels in 2016 and submitted with his second § 440.10 motion, showed that he had two incoming calls on the evening of the robbery at Evans Bank: one at 5:37 PM, and one at 5:38 PM. Daniels therefore

---

[2] The appellate division did, however, reduce the sentence on the reckless driving count to 30-days imprisonment in accordance with New York state law. *Daniels*, 125 A.D.3d at 1433.

argued that a comparison of these times with the timestamps on the images from the bank cameras proved that he was innocent because he could not have been on the phone and robbing a bank at the same time. Noting that Daniels failed to offer proof that the clocks on the cell phone and at the bank were in sync, the trial court concluded that Daniels had failed to rebut the presumption of the regularity of proceedings with substantial evidence. The trial court observed that Daniels "was not convicted as a result of counsel incompetency, but because of the overwhelming evidence of his guilt." Daniels was denied leave to appeal the trial court's orders regarding both of his § 440.10 motions.

On June 19, 2017, Daniels filed *pro se* the instant petition seeking a writ of habeas corpus. The Court is in possession of, and has reviewed, the state record, including transcripts of the trial, Daniels' direct appeal to the Appellate Division and the New York Court of Appeals, and Daniels' § 440.10 motions. Daniels has not challenged the record below as inaccurate. Accordingly, the Court finds that an evidentiary hearing is not necessary in this case.

LEGAL STANDARD

Daniels brings his habeas corpus petition pursuant to 28 U.S.C. § 2254. The general legal principles applicable to such a claim are well-settled. Federal courts are obliged to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214). "First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). "Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain

well-established exceptions." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)). For claims adjudicated on the merits in state court, a federal court may issue a writ of habeas corpus only when the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Chrysler*, 806 F.3d at 117 (quoting 28 U.S.C. § 2254(d)(1)).

A principle is "clearly established Federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)), *cert. denied*, 138 S. Ct. 2578. A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has "decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 403 (citation omitted).

## DISCUSSION

Because Daniels is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). In his petition, Daniels argues that his conviction violated his Sixth

Amendment right to counsel because his trial counsel was ineffective. First, Daniels maintains that his trial counsel was ineffective for failing to obtain and introduce his cell phone records as evidence that would have exonerated him. Pet., 5, June 19, 2017, ECF No. 1. Second, Daniel maintains that his trial counsel was ineffective for failing to present Daniels' girlfriend as an alibi witness at trial. Pet. at 7. Respondent argues that Daniels' claims lack merit. The Court agrees with Respondent.

<u>Ineffective Assistance of Counsel</u>

The Sixth Amendment guarantees a criminal defendant the right to "reasonably effective assistance" of counsel. To establish ineffective assistance of counsel, a defendant must satisfy the two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant's failure to satisfy one prong of this two-pronged test relieves the court of any requirement to consider the other prong. *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991).

First, the defendant must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" under the "prevailing professional norms." *Vadas v. U.S.*, 527 F.3d 16, 20 (2d Cir. 2007) (citing *Strickland*, 466 U.S. at 688). When applying this first *Strickland* prong, courts must be mindful of the variety of approaches effective attorneys might employ when dealing with a particular set of facts, and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Parisi v. U.S.*, 529 F.3d 134, 141 (2d Cir. 2008) (quoting *Strickland*, 466 U.S. at 689). Hence, the Court must "consider the circumstances counsel faced at the time of the relevant conduct and . . . evaluate the conduct from counsel's point of view." *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 689).

9

Second, the defendant must demonstrate he was prejudiced by the ineffective conduct. *Strickland* at 687–88. That is, he must show there is a "reasonable probability" that but for counsel's error, the outcome of the proceeding would have been different. *Strickland* at 694. "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently; instead, [t]he likelihood of a different result must be substantial, not just conceivable." *Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018) (quoting *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011)) (internal quotation marks omitted). Further, in evaluating prejudice, the reviewing court must look to the cumulative effect of all of counsel's unprofessional errors. *Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005). Therefore, "[t]he prejudice inquiry is . . . ineluctably tied to the strength of the prosecution's evidence." *Garner*, 908 F.3d at 862. Indeed, the Second Circuit has stated that, "where a conviction is 'supported by overwhelming evidence of guilt,' habeas relief on the ground of ineffective assistance is generally not warranted." *Waiters v. Lee*, 857 F.3d 466, 480 (2d Cir. 2017) (quoting *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001)).

<u>Daniels' Claims</u>

Both of Daniels' claims fail to satisfy either of the *Strickland* prongs. To put the claims in context, the Court notes that it is apparent from the record in this case that Daniels' counsel had been appointed only a couple of months prior to trial, after Daniels went through two other attorneys. *See, e.g.,* Tr. 275 (the trial court noted, in the course of a discussion regarding Daniels' cell phone and alibi defense, that Daniels has "had three good lawyers here"). Moreover, defense counsel stated on the record – and Daniels did not and

does not deny – that Daniels did not inform counsel of a potential alibi defense based on phone records until at or very near the start of the bench trial. Tr. 274.

Further, Daniels' claim that his trial counsel was ineffective for failing to present Daniels' girlfriend as an alibi witness does not even appear to be factually accurate. As indicated above, prior to summations, defense counsel notified the trial court that Daniels wanted to re-open the case so that his girlfriend could testify that she was on the phone with Daniels around the time of the robbery, and that the two of them were engaged in dinner together around that time, as well. Tr. 273–74. The trial court's response was a swift and definite denial of the motion – "[s]he's not coming in" – as was the trial court's prerogative. *See* N.Y.C.P.L. § 250.20 ("[i]f at the trial the defendant calls such an alibi witness without having served the demanded notice of alibi . . . the court may exclude any testimony of such witness relating to the alibi defense."). In other words, counsel's performance was not deficient because he did raise the issue with the trial court, which swiftly denied his request.

In addition, the Court finds that Daniels has failed to demonstrate that counsel's performance was deficient based on counsel's failure to obtain and introduce Plaintiff's cell phone records. Daniels rightly notes that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. However, the court deciding the ineffectiveness claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case . . . . keep[ing] in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." The record shows that defense counsel did "make the adversarial testing process work" in this particular case: he was well-prepared for trial, he vigorously cross-examined the

11

prosecution's witnesses, he challenged the prosecution's theory of the case with a credible alternative theory based on the inability of the eye-witnesses to identify the robber (Tr. 18), and he even made a last ditch effort to "do some independent research at some local cell phone places to see if we could get a [phone] charger" (Tr. 301). In this context, the Court declines to find that Daniel's counsel's performance was deficient.[3]

Furthermore, even assuming that Daniels was able to satisfy the first *Strickland* prong, his ineffective assistance claims must fail because he has not shown that counsel's purported errors prejudiced his case. Daniels bears the burden of showing prejudice. *Waiters,* 857 F.3d at 479. That is, he has the burden of showing that it is "substantially likely" that his trial would have resulted in a different verdict if his counsel had obtained and introduced his cell phone records at trial as an alibi defense. *Garner*, 908 F.3d at 865. As detailed above, the prosecution presented evidence that at the time of his apprehension, Daniels was wearing pants and shoes that matched the description of those being worn by the Evans Bank robber; that within minutes of the robbery, he was spotted by police, in the area of the bank, in a car that matched the description of that used by the robber; that a high-speed car chase ensued; that Daniels was seen throwing a hooded sweatshirt from his vehicle during the chase that matched the description of the sweatshirt worn by the robber; that police recovered a ski mask from the route of the chase that contained Daniels' DNA; and that at the conclusion of the chase Daniels was found to be in possession of a bag

---

[3] Daniels' papers indicate that he obtained his cell phone records by writing a letter to his service provider in January of 2016. Ex. (Aff.), 35, June 19, 2017, ECF No. 1-1. He did not receive his records, however, until June 2016, approximately five months after his letter request. *Id.* Notably, at the time of trial, defense counsel had been appointed for only approximately two months. It is therefore questionable whether Daniels' counsel would even have received the records in time for trial had Daniels informed him of their relevance immediately upon appointment.

12

containing the missing money from the bank and the bank's GPS tracking device. In light of such overwhelming evidence of his guilt, the Court finds that Daniels has failed to carry his burden to demonstrate prejudice.

CONCLUSION

Based on the foregoing, the Court finds that Daniels has failed to show that his conviction was "contrary to," or involved an unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d)(1). Accordingly, Daniels' application under 28 U.S.C. § 2254 [ECF No. 1] is denied. The Clerk of the Court is hereby ordered to close this case.

Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, because Daniels has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

Dated:      April 20, 2021
            Rochester, New York

ENTER:

CHARLES J. SIRAGUSA
United States District Judge